WOOD et al, Respondents, v. BAPP et al, Appellants.

(169 N. W. 518).

(File No. 4332.    Opinion filed Nov. 29, 1918.    Rehearing denied March 12, 1919).

(1).  Boundaries—Agreement re Boundary—Possession, Adverse Claimant's Agent, Testimony Of, Re Statements of Adverse Claimant's Ancestor—Findings, Sufficiency of Evidence.

While findings should be sustained except where contrary to clear prepondence of evidence, yet held, in a suit involving a

land boundary and adverse claims, where trial court gave un-
due weight to respondents' main witness, a brother of respon-
dents' ancestor, and who as agent handled the quarter section,
whose eastern boundary was in question, ever since the an-
cestor purchased same, and was permitted to testify to acts and
words of the ancestor's sons as acts and words of the farther,
many of which words were inconsistent with the clearly estab-
lished acts of the ancestor and with his words as testified to
by disinterested · witnesses, findings based thereon will not be
sustained on appeal; it appearing that the respondents waited
until the ancestor died before beginning suit for possession of
land which had been adversely held by appellants during the
delayed period; the delay raising strong suspicion that appel-
lants intentionally so delayed, to the end that death might seal
the lips of the only witnesses who knew the truth concerning
many facts upon which said ancestor laid claim to the dis-
puted land; and as said conversations so testified to, had they
been between said witness's principals and said ancestors,
would, under statute, (Code Civ. Proc. Sec. 486, Subd. 1) re-
main a sealed book. The reasons underlying such statute would
apply with almost as much force to the testimony of said
witness, he being clearly interested as agent and relative of
respondents; and his testimony should have been given little if
any weight.

(2). **Same—Lost Corner—Agreement on Quarter Line as True Line,
Acquiescence In, Possession Under—Fence on Agreed Line—
New Line Under Adverse Claimant's Re-survey—Acquiescence
on Agreed Line, Sufficiency of Evidence.**

Where, in a suit for possession of land, the undisputed or
clearly preponderating evidence showed, that B and S, adjoin-
ing federal homesteaders, being unable to find the quarter cor-
ner, and believing that the correct boundary was 160 rods west
of and parallel with the west line of the N. E. ¼, the B
land, they with a surveyor located a line accordingly, B, at
S's suggestion marking the line by plowing a ridge, both be-
lieving that they had placed the line where it legally belonged;
both parties thereafter having substantially claimed to and
acquienced in said line as their boundary as long as either one
remained in possession of their respective tracts either as own-
er or tenant; thereafter acquired federal patents describing the
lands as containing the number of acres shown by government
plat; that thereafter B conveyed to L the "W½ of the NE¼
of Sec. 18 * * * containing 80 acres," B thereafter farming
same as L's tenant; that after L conveyed said 80 to F, B
continued in possession as F's tenant; that during one year
while L held title to the 80 she rented the hay land to S's

agent, who cut up to the agreed line; that by mesne convey-
ances said 80 was re-conveyed to B, he and his heirs continuing
to claim ownership to the agreed line to time of commence-
ment of action by S's successor in interest; that B, 28 years
after establishing the agreed line built a fence thereon which
has remained ever since; that none of the grantees of said 80
ever claimed any part of the 80 rod strip eastward claimed by
B as the E½ of NE¼; that, S's land (NW¼) passed by title
under foreclosure to a third party, the latter and their gran-
tees claiming to and not beyond said agreed line; that defen-
dants sons of B rented said NW¼, accounting for crops to but
not beyond said line; that 18 years after said agreed line was
established, the then owner of the SW¼ of said section em-
ployed a surveyor to locate said lost quarter corners, placing
stones to mark them and filing record in proper office; the
township having next year employed him to locate the lines
within such township, he having filed record of corners by him
previously established, which corners were some distance east
of those established by said agreement; that 20 years later an-
other surveyor employed by respondents, claimants to said
NW¼, located another boundary line some 50 feet east of
where said first surveyor had located same; held, that the evi-
dence clearly shows that respondents and those under whom
they claim fully acquiesce in said line as originally agreed up-
on; that it would require most clear evidence of renunciation
by the parties claiming east of said line of all claim to land in
said "W½ of NE¼" to remove the presumption that they ac-
quiescenced in a thing so much in their favor as recognition of
the agreed line as their boundary.

(3).   **Same—Claiming to Agreed Line—Evidence, Whether as to
Claimed Line as "True Line"—Evidence of Knowledge of Un-
certainty of True Line, Effect—Adverse Possession, Finding
Required.**

The contention by respondents, claimants to disputed land
involving an agreed quarter section line, that adverse claim-
ants' ancestor was claiming to the agreed line merely because
he believed it to be the true line, is not tenable, where the
evidence showed that said ancestor knew there was question as
to where the lost corner, whose loss occasioned the establish-
ment of the agreed line, should have been located; the evidence
showing that said ancestor intended to maintain possession of
and claim title to the disputed line regardless of where the
line should have been; that he not only acquiesced in but
held to said line as the actual boundary; and it being clear
that, if, as claimed by respondents, neither they nor their an-
cestor ever acquiesced in said agreed line as the boundary, then

it necessarily follows that adverse claimants' possession was adverse; hence, trial court should upon proper findings, have entered conclusion and rendered judgment in favor of said adverse claimants upon the ground of adverse possession, if it failed to find sufficient evidence to sustain judgment on claim of agreed boundary.

(4). **Same—Disputed, Doubt re True Boundary, Adjoining Owners' Establishment of Line by Parol, Tenability—Agreement Distinguished from Parol.**

Wherever there is dispute, doubt, or uncertainty as to true location of a boundary line, adjoining owners may by parol fix a line which, when followed by possession with reference to boundary so fixed, will bind them. Such agreements do not operate as land conveyances, but proceed on theory that the agreement establishes the line to which title of each extends.

(5). **Same—Homesteader, Preemptioner, Right Of, To Establish Agreed Boundary—Possession Under Agreement.**

A homestead entryman, and a preemptioner in possession and improving land, have respective vested interests in the land sufficient to sustain an agreement between them for a permanent boundary line, where corners were lost; and adverse possession may be held by each under agreement of title to such agreed line; since anyone having an interest that will support adverse possession, has such interest as authorizes him to agree as to boundary line.

(6): **Adverse Possession—Title Under Agreed Boundary, Possession for Statutory Period, Whether Necessary.**

Possession under an agreement by adjoining land owners upon a boundary line, need not be for full statutory period requisite for acquiring title by adverse possession.

(7). **Boundaries—Agreement Fixing—Dispute, Doubt, Uncertainty, As to Correct Line, As Consideration for Agreement—Procuring Survey, Effect.**

While an agreement fixing a boundary line must, to make it binding, be based upon sufficient consideration, yet where there is dispute as to correct boundary, or doubt or uncertainty as to correct location thereof, the definite settlement of such dispute, doubt, or uncertainty, is of itself a sufficient consideration to support the agreement. **Held**, further, that the joint action of adjoining owners in procuring survey for an agreed line and participating therein, was a good consideration for the agreement that the line so located should be the boundary.

(8). **Same—Lost Quarter Corners, Agreed Boundary Line—Government Field Notes and Plates, Access to, Whether Failure to Use Rendered Agreed Line a Parol Void Conveyance.**

The fact that government records—field notes and plats—

furnished data from which a surveyor could have ascertained correct quarter section line, does not render an agreement by adjoining land claimants upon a boundary line an attempt to convey land by parol which is void under statute of frauds. So held, where both claimants were in ignorance that there was any shortage in the half section embracing the two quarters, or, if they knew of the shortage, were perchance ignorant of the correct rule for locating lost corners in case of shortage and who located and agreed upon a line as their boundary, and honestly and in good faith attempted to locate the same where they believed it belonged.

(9). Same—Agreement for Settlement of Unlocated, Disputed Boundary—Legally Favored—Preventing Litigation—Scope of Rule.

Agreements having for their object the settlement of unlocated or disputed boundaries should be and are looked upon with favor, as they are a most satisfactory means of preventing spiteful and vexatious litigation. Nor should such rule be confined to cases of mistake in description of deeds; while it should apply to cases where monuments marking the division lines are missing.

(10). Same—Agreed Boundary, Mutual Mistake of Fact or Law as Basis—Whether Binding Agreement—Voidable Agreement, Right to Renounce, Unless Estopped.

While the agreement entered into in this case should not be deemed an arbitrary attempt to transfer realty, and therefore void under statute of frauds, it did have its inception in, and was the outgrowth of a mutual mistake, either of fact or law, and was therefore not binding upon either party. But held, that it was not void; but either party might have renounced same unless equitably estopped therefrom. Acquiescence after knowledge of mistake validate the agreement.

(11). Limitations—Possession Under Twenty Years' Statute—Minority of Heir, Adverse Possession Prior to Ancestor's Death, Effect Re Tolling of Statute.

Where adverse possession under the twenty year statute, commenced prior to death of an ancesstor, the minority of a heir during the remaining portion of said period does not toll the statute, either as to the heir or other claimants under the ancestor.

Appeal from Circuit Court, Minnehaha County. Hon. Joseph W. Jones, Judge.

Action by John L. Wood, individually, and as administrator of the Estate of John J. Wood, deceased, and another, against

Will A. Bapp, individually, and as administrator of the Estate of Ezra S. Bapp, deceased, and others, to determine adverse claims to realty, and for possession of same. From a judgment for plaintiffs, and from an order denying a new trial, defendants appeal. Reversed.

*Krause & Krause,* for Appellant.

*U. S. G. Cherry,* and *Roy B. Marker,* for Respondents.

(2) To point two of the opinion, Appellants cited:

McNamara v. Seaton, 82 Ill. on p. 500; Klinker v. Schmidt, (Ia.) 87 N. W. on p. 662; Jones v. Pashby (Mich.) 35 N. W. 153; 9 Corpus Juris, secs. 171 and 180; Brummell v. Harris, 148 Mo., 430; Pease v. Whitney, (N. H.) 98 Atl. on p. 65.

Respondents cited:

St. Bede College v. Webe et al, 168 Ill. 324, 48 N. E. 165; Palmer v. Osborne et al, 115 Iowa 714, 87 N. W. 712; Manistee Manuf'g Co. v. Cogswell, 103 Mich. 602, 61 N. W. 884; Smith v. McAllister, 14 Barb. 437.

(3) To point three, Respondent cited:

Ingalls v. Gunderson et al, S. D. 157, N. W. 1055; Fisher v. Muecke, 82 Iowa 547, 48 N. W. 936; Edwards v. Fleming, 83 Kan. 653, 112 Pac. 836; Dunnigan v. Wood, 58 Ore. 119, 112 Pac. 531.

(4) To point four, Appellants cited:

Turner v. Baker, (Mo.) 27 Ann. Rep. on p. 234; Crowell v. Beebe, 10 Vt. 33; 33 Am. Dec. on p. 174; Wilson v. Hudson, 8 Yerger Rep. (Tenn.) 398 (407); 5 Cyc. 930; Case note to Kitchen v. Chantland, 8 Ann. Cas. on p. 85.

(5) To point five, Appellant cited:

Phinizy v. Gurnsey, 50 L. R. A. p. 622, at par. 1; Warwelle on Vendors, 2nd Ed., sec. 176; Mosley v. Eversole, (Ky.) 147 S. W. on p. 428; Silvarer v. Hansen, 20 Pac. 136; Mott v. Hopper, 40 So. 921-3; Jordon v. Deaton, 23 Ark. 704; U. S. v. Turner (C. C. A.) 54 Fed. 228; U. S. v. Ball (C. C. A.) 31 Fed. 667; Sec. 1631 Rev. Codes 1903; S. D. Code Civ. Pro. Sec. 690; C. L. 1887 Sec. 5464; Sec. 650, Territorial Civ. Proc; Act Cong. March 3, 1873, c. 266, 17 Stat. 602; Baker v. Hollobaugh, 15

Ark. 325; Forbes v. Driscoll, 4 Dak. 336, May v. Labbe, (Me.) 96 Atl. 502.

Respondents cited:

Hohn v. Bidwell, 27 S. D., 249, 130 N. W. 837; Tyee v. Cons. Min. Co. v. Langstedt, 136 Fed. 124; Dolen v. Black, 48 Nebr. 688, 67 N. W. 760.

(6) To point six, Appellants cited:

Garvin v. Threlkelt (Ky.) 190 S. W. 1902, and cases cited; Nichols v. Tallman (Mo.) 189 S. W. 1184—headnote 9; *"Such agreed line takes the place of the original line"*; Turner v. Bowens (Ky.) 203 S. W. 749.

(7) To point seven, Appellant cited:

5 Cyc. 592; Payne v. McBride (Ark.) 1912 Ann. Cas. 661; Kitchen v. Chantland, (Ia.) 8 Am. Cas. 83; Smith v. Hamilton, 20 Mich. 433.

(11) To point eleven, Appellants cited:

1 Cyc. 1021, 1024; 25 Cyc. 368-9; Alvarado v. Nordholt, 95 Cal. 116; McLearan v. Benton, 73 Cal. 329.

Respondents cited:

Am. & Eng. Ency. of Law, Vol. 12; Hill v. Saunders, 4 Rich. L. (S. Car.) 521, 55 A. D. 696; Harris v. McCrary, Idaho, 105 Pac. 558.

WHITING, P. J.   This action, commenced in May, 1916, was brought to determine adverse claims to a tract of land in section 18 of a certain township.   The whole controversy rests upon a dispute as to the location of the boundary between the N. W. ¼ owned by plaintiffs and the N. E. ¼ owned by defendants. Findings and judgment were for plaintiffs.   From such judgment and an order refusing a new trial this appeal was taken.

The government plat shows the half section to be practically a rectangle—the N. E. ¼ to be 40 chains square, the N. W. ¼ to be 40 chains north and south and practically 38 chains east and west.   In reality the half section is in shape and dimensions as shown by the annexed plat.   Appellants claim, and are in possession of, the tract "E. B, C, F," comprising practically 160 acres and with its boundary "E, F," 160 rods west of the east line.

Respondents claim and seek possession of about 30 acres of the tract "E, B, C, F," to wit, the tract "E, G, H, F," claiming same as a part of the N. W. ¼.

It is undisputed that the four corners of the section as well as the east and west quarter corners, are located on the points marked by the original government mounds; that, if this half section had been properly surveyed by the government surveyor, the line "E, F," would have been the west line of the N. E. ¼; that the government mounds at the north and south quarter corners had become lost before this land was ever entered for settlement; that, such corners being lost, they should have been located so that the boundary between the N. E. and N. W. ¼'s would have been at about the line "G, H." It is upon these facts that respondents base their claim.

Appellants, conceding the above facts, contend that they own up to the line "E, F," by virtue of an agreement as to boundary line entered into between one Sawyer, entryman and patentee of the N. W. ¼ and the party under whom respondents claim, and Ezra S. Bapp, entryman and patentee of the N. E. ¼ and the party under whom appellants claim. Appellants not only claim

that such boundary was established by express agreement effective as soon as entered into and acted upon, but they claim such boundary through acquiescence therein, and also through alleged adverse possession of the land up to such boundary. Appellants also pleaded want of possession in respondents and those under whom they claim for a period sufficient to bar their right to bring this action.

Respondents contend: (a) That there is no sufficient evidence to establish the alleged agreement. (b) That there is no sufficient evidence to show the line as agreed upon, if there was an agreement, is located at line "E, F." (c) That such agreement, if any, was not binding because based on mutual mistake. (d) That if there was no mutual mistake, then it was an attempt to establish an aribitrary line regardless of the true line, and therefore a void attempt to convey land by parol. (e) That the correct line, the line claimed by respondents, was not doubtful or uncertain, as it was readily ascertainable—as they claim it was afterwards ascertained—by survey; and that there must be doubt or uncertainty as to the correct line to support an agreement such as relied upon by appellants. (f) That the agreement, if any, was entered into by entrymen on government land, who had no such title to the land as would support such an agreement. (g) That, there being no binding agreement, acquiescence alone would not estop respondents, because to work an estoppel such acquiescence must be for the period required for acquiring title by adverse possession, and there was not acquiescence for such period. (h) That the evidence showed that appellants' ancestor only intended to claim to whatever was the true line, and that therefore his possession never became adverse. (i) That in any case there never was uninterrupted adverse possession for 20 years. (j) That even if there were adverse possession prior to September, 1892, such as would set the statute of limitations running, such statute was then tolled as to respondents, and remained tolled until about 1911, owing to the fact that in September, 1892, this land descended to respondents through the death of the prior owner, and from that date to the year 1911 one respondent was a minor.

Appellants contend that there was acquiescence until long after 1892, but if there was not acquiescence on part of respondents in 1892, then appellants' possession was adverse prior to the

death of respondents' ancestor, and that, the statute having for that reason commenced to run prior to the time that title devolved upon the minor, the running of such statute was not tolled by his minority.

[1] With the issues thus defined we will now call attention to the facts as they appear to us from the record. We shall not attempt to set forth the evidence or to consider all the various contentions of the parties as to what is proven thereby. Appellants question the sufficiency of the evidence to support certain of the court's findings and assign as error the court's refusal to make certain requested instructions. We think the court erred in its findings. We do not overlook the fact that the findings of the trial court should be sustained except where they are contrary to the clear preponderance of the evidence, but we are convinced that the trial court must have given undue weight to the evidence of respondents' main witness, one George L. Wood, a brother of respondents' ancestor who, as agent, handled the N. W. ¼ ever since respondents' ancestor purchased same. To our minds his testimony lacks evidentiary force because of his very apparent lack of memory, because of the erroneous basis upon which much of his testimony rested—that the acts and words of the sons of Ezra S. Bapp were in effect the acts and words of the father—and because of the fact that the words he attempted to put in the mouth of Ezra S. Bapp were many of them absolutely inconsistent with the clearly established acts of said Bapp and with such statements of Bapp as were testified to by disinterested witnesses. Prior to the trial the lips of Ezra S. Bapp had been sealed by death. He was the one and only person who, if living, could (and, judging from what otherwise appears, undoubtedly would) have disputed many of the statements of this witness. As agent and relative of respondents this witness certainly was not disinterested. Moreover, it is clear that respondents were claiming this disputed tract as early as 1911, and soon thereafter were threatening suit. At that time both patentees were living, but were old men. Respondents waited suit until Bapp died and until his heirs had, pursuant to statutory provision, preserved in form of deposition the testimony of the other patentee, and they so delayed suit though appellants were continuing in the open adverse possession of the disputed land. There is certainly enough in this record to create

at least a strong suspicion that respondents intentionally delayed suit to the end that death might seal the lips of the only two witnesses who knew the absolute truth in relation to many of the facts upon which Ezra S. Bapp laid claim to the disputed land. George L. Wood's testimony related in part to conversations he had with Ezra S. Bapp. These conversations, if they had been between Wood's principals and Bapp, would, under the statute, have remained a sealed book. The reasons underlying such statute would apply with almost as much force to the testimony of this witness, interested as he clearly was. In the light of all the above, the trial court should have given little, if any, weight to this witness' testimony. Dake v. Ward, 150 N. W. 51.

[2] The following facts are undisputed or else sustained by the clear preponderance of the evidence: In the year 1873 Ezra S. Bapp made homestead entry upon the N. E. ¼, which we will hereafter speak of as the "Bapp" land, and Ezekiel T. Sawyer made pre-emption entry upon the N. W. ¼, which we will hereafter speak of as the "Sawyer" land. Being unable to find the quarter corner, and both being desirous of improving their lands, they met in the spring of 1874 and sought to establish between themselves their common boundary. They were both of the opinion that the correct boundary line was 160 rods west of and parallel with the east line of the Bapp land. They procured a surveyor and as chainman they assisted him in locating this line. They ran a line directly west from point "B" to point "I," 160 rods and constructed a mound and placed a stake thereon. Another stake was placed to the south. To make the line more definite and guard against mistakes, Bapp, on the same day and in accordance with suggestions made by Sawyer, marked the line by plowing a ridge of three furrows. They undoubtedly believed that they had placed the line where it legally belonged, and it is perfectly clear that they agreed that it should be the permanent line between them. (Whether these parties were, at that time, ignorant of the location of and distance to point "A" and were laboring under the mistaken belief that the half section was as platted by the government, or whether, knowing the facts as to the size and shape of the half section, they mistakenly supposed that, as a matter of law, the correct place to locate the lost corner was at the point where the government surveyor should have located it—a rule by

the way, sustained by the courts of two states—does not appear). Sawyer proceeded at once to break his land, breaking up to this established line, which we will hereafter speak of as the "Bapp-Sawyer" line. Bapp's improvements were mainly upon the east part of his land, but he did in 1874 break a strip commencing near "B" and reaching to "I." This strip he supposed to be entirely upon his own land. This strip was not in fact wide enough to reach point "E." From that time on, Bapp and Sawyer in their methods of farming clearly recognized and acquiesced in the "Bapp-Sawyer" line as their boundary as long as either one remained in possession of their respective tracts either as owner or tenant. In 1878 both parties made final proof. Sawyer's patent was issued in 1879 and Bapp's in 1880. Their filing papers and patents described the lands as containing the number of acres shown by government plat, and all deeds and mortgages hereinafter mentioned described the lands according to government description, including acreage.

In 1878, but after final proof and issue of final receipt, Bapp conveyed to one Lyons, the "west ½ of the N. E. ¼ of section 18 * * * containing 80 acres." Bapp continued to live on the east 80 acres, and, as tenant of Lyons, farmed the west 80 acres—there being, however, on the west 80 but the small strip of breaking above referred to. Lyons conveyed this west 80 acres to Farwell in 1883. Bapp continued in possession under Farwell and cultivated this strip of land. During one year while Lyons held title to this west "80 acres," she rented the hay land thereon to George L. Wood, and he cut up to the Bapp-Sawyer line, as her tenant . In the year 1891, one Guild rented this hay land, and cut same up to Bapp-Sawyer line. During the other years Bapp cut the hay. In March, 1892, Farwell conveyed this "80 acres" to Guild, and Guild, in April of same year, conveyed it to Ezra S. Bapp Bapp continued to hold title to all of the N. E. ¼ until his death, and appellants have succeeded to such title. During all of the years down to the bringing of this action, Ezra S. Bapp, and after him the appellants, claimed to own the land clear to the Bapp-Sawyer line, and they were in possession of same, except the hay land as above noted. Immediately after repurchasing the "80 acres" in 1892, Bapp proceeded to break up the grass land thereon clear up to the Bapp-Sawyer line, and up to 1895 at least

he in person, and after that either in person or by tenant, farmed this land as his own, taking all the crops therefrom. Appellants did the same after his death, which occurred in October, 1915. In 1902 Bapp erected a fence on the "Bapp-Sawyer" line, and such fence has remained there ever since. There is absolutely no evidence that Lyons, Farwell, or Guild ever made any claim that their deeds covered any part of the 80-rod strip claimed by Bapp as the E. ¼ of N. E. ¼. (By acquiescing in Bapp's ownership of the east 80-rod strip, they would, in effect, acquiesce in the division made by Bapp and Sawyer.) Sawyer mortgaged his land in 1882, and lost it on foreclosure to one Smith in December, 1888. Smith did not take actual possession of the land, but in March, 1889, conveyed to respondents' ancestor, John J. Wood. Up to 1894 Wood leased his land to parties in no way connected with Bapp. These parties farmed up to the Bapp-Sawyer line, but not to the east thereof. Respondents acquired title to the Sawyer land through death of John J. Wood in September, 1892. In the fall of 1893 a son of Ezra S. Bapp rented this land for year 1894 from George L. Wood. The same party rented in 1895. From 1895 on for many years, different sons of Ezra S. Bapp rented the Sawyer land, farming the same up to the Bapp-Sawyer line and accounting for crops up to such line and no further. In 1896 and 1897 Ezra S. Bapp joined in the renting of the Sawyer land.

In 1892, the owner of the S. W. ¼ of this section employed one Patten, a surveyor, to locate the lost quarter corners. This he did, placing stones to mark such corners and filing a record of his work in the proper office. In 1893 the township employed Patten to locate the lines within such township. In so doing he included these same corners and filed a record. The line marked by the corners as located by him is at about the line "G. H." In 1913 another surveyor, employed by respondents, located the line "G, H," putting the same average of over 50 feet east of where Patten located same.

There was absolutely no evidence worthy of consideration showing that there was not actual and continual acquiescence in the Bapp-Sawyer line down to the time when George L. Wood commenced to rent to the sons of Ezra S. Bapp. To our minds the evidence clearly shows that respondents fully acquiesced in

this line for several years, and certainly it would take most clear evidence, and evidence showing that Lyons, Farwell, Guild, and Ezra S. Bapp actually renounced all claim to the land up to the Bapp-Sawyer line, to remove the presumption that they acquiesced in a thing so much in their favor as the recognition of such line as their boundary.

[3] Respondents seem to be of the view that there was a period, commencing when their ancestor acquired title and extending for several year, during which there was no acquiescence in the Bapp-Sawyer line by themselves or their ancestor and no adverse possession up to that line by Ezra S. Bapp. Their position seems to be that they and their ancestor never acquiesced in the boundary, and that Ezra S. Bapp was claiming to the Bapp-Sawyer line merely because he believed that to be the true line, and was not claiming the land up to that line regardless of whether that was the true line. Respondents are in error. It is clear that from 1892 on, Bapp knew that there was a question as to where the lost corner should have been located. According to the testimony of Guild, a witness called by respondent, when he sold the "80 acres" to Bapp, he advised Bapp that he would not warrant title clear to the Bapp-Sawyer line, saying, "You will have to stand your shortage the same as I had to in 7, the pro rata," and that Bapp replied, "Possession is nine points in law." To our minds this evidence discloses that Bapp was advised of the uncertainty as to boundary, and intended to maintain possession of, and claim title to, the disputed tract regardless of where the line should have been. This intent was further manifested by his immediately breaking this land up to the Bapp-Sawyer line and cultivating it year after year, and in 1902 putting a fence along the Bapp-Sawyer line. We are satisfied that from the day the Bapp-Sawyer line was agreed upon there was, upon the part of Bapp, not only acquiescence in that line as the boundary, but an intent on his part, in consonance with his agreement with Sawyer, to hold to this line as the actual boundary, and most certainly there was this intent at all times after 1892 as long as he lived. If, as claimed by respondents, neither they nor their ancestor ever acquiesced in the Bapp-Sawyer line as the boundary, then it necessarily follows that Bapp's possession was, from April, 1892—the time he repurchased the "80 acres," took possession of the dis-

puted tract under such purchase, and commenced to break clear up to the Bapp-Sawyer line—adverse to respondents' ancestor and afterwards to respondents. Bapp was not merely claiming to the true line whereever it might be, but he was claiming to the Bapp-Sawyer line as the boundary, thus bringing this case under the rule laid down in Ingalls v. Gunderson, 37 S. D. 295, 157 N. W. 1055, and Battner v. Baker, 108 Mo. 311, 18 S. W. 911, 32 Am. St. Rep. 606. This boundary line was as clearly defined as though a fence stood there instead of the line of breaking.

We are therefore of the opinion that the trial court erred in its findings, and that, under proper findings, it should have entered conclusions and rendered judgment in favor of defendants upon the ground of adverse possession, if it failed to find sufficient to sustain judgment on claim of agreed boundary. This necessitates a new trial, and we therefore feel in duty bound to consider other questions presented, part or all of which may arise upon a new trial.

[4] Wherever there is a dispute, or doubt, or uncertainty as to the true location of a boundary line, the adjoining owners may, by parol, fix a line which, at least when followed by possession, with reference to the boundary so fixed, will be binding upon them. Kip v. Norton, 12 Wend. (N. Y.) 127, 27 Am. Dec. 120; Garvin v. Threlkeld, 173 Ky. 262, 190 S. W. 1092; Kitchen v. Chantland, 130 Iowa, 618, 105 N. W. 367, 8 Ann. Cas. 81.

Such agreements do not operate as conveyances of land, but proceed upon the theory that the agreement establishes the line to which the title of each extends. La Mont v. Dickinson, 189 Ill. 628, 60 N. E. 40; Garvin v. Threlkeld, supra; Payne v. McBride, 96 Ark. 168, 131 S. W. 463, Ann. Cas. 1912B, 661.

[5] It is urged by respondents that these entrymen had no title to the land and nothing upon which to base an agreement. This court recognized in Reservation State Bank v. Holst, 17 S. D. 240, 95 N. W. 931, 70 L. R. A. 799, that a homestead entryman has a vested interest in the land entered; we believe the same to be true of a pre-emptioner who has entered into possession and is improving the land. Page v. Fowler, 28 Cal. 611. In the Page Case, as also in Boe v. Arnold, 54 Or. 52, 102 Pac. 290, 20 Ann. Cas. 533, it was held that a pre-emptioner could hold adverse pos-

14—Vol. 41, S. D.

session as against everybody but the United States. Certainly any one who has such an interest as can support adverse possession has such an interest as will authorize him to enter into an agreement as to boundary line. See, also, Jordan v. Deaton, 23 Ark. 704; Mosley v. Eversole, 148 Ky. 685, 147 S. W. 428.

[6] Possession under the agreement need not be for the full statutory period requisite for acquiring title by adverse possession. St. Bede College v. Weber, 168 Ill. 324, 48 N. E. 165; Garvin v. Threlkeld, supra; Kitchen v. Chantland, supra; and notes 8 Ann. Cas 83.

[7] Like every other contract, an agreement fixing a boundary line must be based upon a sufficient consideration or else it is not binding. Where there is a dispute as to the correct boundary line, or a doubt or uncertainty as to the correct location thereof, the definite settlement of such dispute or such doubt or uncertainty is in and of itself a sufficient consideration to support the agreement. 9 C. J. 231. But in this case there was neither dispute, doubt, nor uncertainty. These parties were fully agreed that the boundary was a fixed distance from a known line. If then, after learning that they were thus agreed, they had said, "Our line is 160 rods west of the east section line, and a line so located shall be our boundary," such agreement would have been exactly as though they had found stakes which they supposed were, but which were not, government stakes marking quarter corners, and both fully believing them to mark the true line had agreed that they did. Such an agreement would be without consideration. Duel v. Bluembke, 154 Wis. 519, 143 N. W. 179. But these parties did not merely agree that their boundary line was a certain imaginary line—they took steps to locate and mark such line. To that end they employed a surveyor and themselves assisted the surveyor in locating and marking same, and furthermore, Bapp marked the line by plowing the furrows. They then agreed, not that this was their boundary line if correctly located, but that this line as located was their boundary. In the Duel Case, supra, the court, speaking of want of consideration, call attention to the fact that, "The adjoining owners did not jointly procure the survey to be made." The procuring of the survey in the case now before us and the assisting therein was a good consideration for the agreement that the line so located should be the boundary.

[8] But it is earnestly contended that, inasmuch as the government records—the field notes and plats—furnished the data from which a surveyor could have ascertained the correct line, the agreement of these parties fixing a boundary line was an arbitrary location of such line, and therefore an attempt to convey land by parol, and void under the statute of frauds. Undoubtedly if Bapp and Sawyer knew that the half section was short, and knew the rule as to pro rata division of the section line that should control when locating lost quarter corners, then they would have known that the quarter corner should have been located at much less than 160 rods from the east line, and any agreement such as they entered into would have been, in effect, an attempted conveyance by parol. But we should hesitate to hold that where two parties, who were in ignorance that there was any shortage, or who, if they knew of the shortage, were perchance in ignorance of the correct rule for locating the lost corner in case of shortage, locate a line and agree upon it as their boundary, honestly and in good faith attempting to locate same where they believe it legally belonged, they are acting arbitrarily and their agreement amounts to an attempted conveyance of land rather than an establishment of the tracts covered by the titles they already have; and to so hold because, forsooth, such parties might have found the government mound at point "A"—if they already did not know of it—and might have measured the distance from "A" to "B," and might have consulted the government field notes and plats, and might have ascertained the correct rule of locating the lost corner, or might have employed a surveyor to locate it for them, and thus might, and probably would, have learned somewhere near where the corner should be.

[9, 10] Agreements having for their object the settlement of unlocated or disputed boundaries should be, and are, looked upon with favor, as they are a most satisfactory means of preventing spiteful and vexatious litigation. To hold with respondents would render invalid the vast majority of agreements fixing boundaries. The books are filled with cases where agreements have been upheld where the true boundary could have been readily ascertained. Respondents expressly state that such agreements should be restricted to those cases "where there is a mistake in the description as shown by the deeds and where because of conflicting descrip-

tions it would be difficult to correctly locate the dividing line," and should not apply "to cases where the monuments marking the division line are missing." We cannot subscribe to any such rule. While the agreement entered into in this case should not be deemed an arbitrary attempt to transfer real property, and therefore void under the statute of frauds, it did have its inception in, and, as hereinbefore noted, was the outgrowth of, a mutual mistake, either of fact or law, and was therefore not binding upon either party. Randleman v. Taylor, 94 Ark. 511, 127 S. W. 723, 140 Am. St. Rep. 141.

But, although not binding, it was not void. Either party might have renounced same, unless equitably estopped from so doing. Acquiesence after knowledge of mistake would validate the agreement. Respondents seem to concede that acquiescence without an agreement, if such acquiescence continues for the period required for obtaining property by adverse possession, is sufficient to work an estoppel.

[11] Owing to possession by appellants and their ancestor, neither respondents nor their ancestor were in possession of any part of the disputed tract for more than 20 years prior to the commencement of this action. Appellants contend that respondents were barred by section 43, C. C. P., from maintaining this action. Respondents contend that this statute was tolled because of the minority of John L. Wood. The adverse possession, if it was adverse, commenced in 1892 prior to death of respondents' ancestor. A right of action for possession accrued to him then, and the running of the statute commenced before title devolved on the minor. The statute having commenced to run, the running thereof would not be tolled because of the minority of this respondent. 17 R. C. L. 869.

The judgment and order appealed from are reversed.