OSBERG et ux, Respondents v. MURPHY et al., Appellants

(221 N.W.2d 4)

(File No. 11341. Opinion filed August 31, 1974)

Lynn, Jackson, Shultz, Ireland & Lebrun, Rapid City, for plaintiffs and respondents.

William M. Rensch, Rapid City, for defendants and appellants.

BIEGELMEIER, Chief Justice.

In this boundary line dispute the trial court entered judgment for plaintiffs and defendants appeal.

In 1960 C. A. Carter was the owner of three irregular tracts of land in the Black Hills platted as Tract A and Lots 13 and 14 of Sec. 24, Twp. 1S, R. 4E, B.H.M. The easterly boundary of Tract A is the westerly boundary of Lot 14. By deed dated August 4, 1961,[1] Carter conveyed Lots 13 and 14 to Mr. and Mrs. King who conveyed them to plaintiffs Osbergs in 1964. When Kings purchased the lots there was no fence or other physical evidence dividing the properties or indicating the boundary between Tract A and adjoining Lot 14. Mr. King

---

1. The testimony on many subjects is in general terms and difficult to reconcile; for instance, when the deed from Carter to Kings was put into evidence, Mr. King was asked if "it (the deed) would show that you took possession of the property in '60?", to which he answered, "Yes."

testified he wanted to graze three head of calves on this land, and, as the fences were bad, he discussed putting up a fence with Carter, and thereafter a fence was built. The facts as to this will be detailed later in the opinion. Carter conveyed Tract A to one Reeves who in 1969 conveyed it to the defendants Murphys.

By reason of the Murphys' desire to make some improvements on Tract A, in 1972 they caused a survey to be made of Tract A which showed the fence was not built on the true boundary; it commenced at the correct boundary on the north common corner of Tract A and Lot 14, but it ran west of the true boundary encroaching 274 feet on Tract A at the south end. Thus, the fence enclosed a triangular tract with a base of 274' and sides of about 500' consisting of about an acre of land that is claimed by plaintiffs Osbergs.

Plaintiffs commenced this action in 1972 seeking to have the fence that was built in 1961 declared to be the legal boundary line. A trial to the court resulted in findings of fact, conclusions of law and a judgment favorable to plaintiffs Osbergs.

The parties do not differ on the legal principles involved, as is so stated in the trial judge's memorandum decision, for they both quote it in full and rely on it.

We quote from salient parts of this memorandum decision with added identifications of paragraphs for reference purposes:

A. "The legal principles involved in cases of this nature are well settled and may be summarized by quoting the following passage from 12 Am.Jur.2d, Boundaries Sec. 78:

B. 'It is now a well-settled principle of law that an unascertained or disputed boundary line dividing lands of adjacent landowners may be permanently or irrevocably established by a parol agreement of the adjacent owners . . . . It is, however, essential to the validity and binding effect of such agreements that the boundary line fixed by the agreement be definite, certain and clearly marked,

and that it be made by the adjoining landowners with reference to an uncertain or disputed boundary between their land. Such oral agreement, when executed and actual possession taken under it, becomes conclusive against the owners and those claiming under him.'

C. These basic principles have been adopted by the South Dakota Supreme Court. See, Wood vs. Bapp, [4] S.D. 195] 169 N.W. 518 (1918); See also, 11 C.J.S., Boundaries Sec. 64(a) Sec. 67.

(Here appears a paragraph stating that the parties predecessors in title were adjacent landowners; that an uncertainty existed as to the precise boundary line; and that they agreed to establish and mark the boundary by a fence and possession from 1961 to 1972.)

D. "Therefore, the only real issue before this court is whether the property line established by Mr. King and Mr. Carter was the result of a mutual mistake. When used in the context of cases of this nature the term 'mutual mistake' relates to the intent of the parties involved, and not to the mere fact that the line established by them was not in conformity with the original boundary line. The rule is aptly stated at 12 Am.Jur.2d, Boundaries Sec. 82 as follows:

E. 'If, however, the parties undertake by parol agreement to fix the location of a boundary line *under the belief that they are fixing the true boundary line,* when, in fact, it is not, their agreement is not binding and may be set aside by either party upon discovery of their mistake. . .' "

The court concluded that the facts were such that the controversy should be ruled by the law set out in paragraph B of its decision.

It is clear that the facts were such as to require the application of the law in paragraph E, i. e., if the parties made their agreement *"under the belief that they are fixing the true boundary line*, when, in fact, it is not, their agreement is not binding and may be set aside by either party upon discovery of their mistake. . ."

Plaintiffs' evidence about that came solely from Rolland King who purchased Lots 13 and 14 from Carter, and claimed to have made the agreement and built the fence pursuant thereto. The failure of Carter to testify was unexplained, though King's testimony that in 1960-1961 Carter wasn't able to do any physical work as he was "quite elderly" and "had asthma quite bad" might explain his absence.

The only question confronting the court is, "Was the evidence such as to compel the application of the law set out in paragraph E?" For that answer we turn to King's testimony as follows:

"A Yes. I contacted Mr. Carter, and we decided to find what we figured was the boundary line between the two properties.

    \* \* \* \* \* \*

"Q Well, after you were occupying Lots 13 and 14, what was located on the property that is in question here when you owned this property? What was located on the property?

"A The property in question here, there was a gravel pile, and they used it for a hot pit, you know, for the highway to mix their tar and stuff.

    \* \* \* \* \* \*

"A No. Before we done any measuring or anything, Mr. Carter and I went down and looked the property over, Lots 13 and 14, and he told me at that time— showed me approximately where the cross fence would go.

"Q Yes. Was that about where it later went, where you later put the fence?

"A Yes, fairly close.

"Q So at the time you purchased the property and prior to the construction of the fence, you had been advised by Mr. Carter that that was the approximate location of the legal boundary line between the two properties, isn't that correct?

"A Yes.

"Q So at the time that you subsequently placed the fence there, you placed it there with the thought that it was the legal boundary line between the two properties, am I correct?

"A Yes, to my knowledge.

"Q You didn't put it there arbitrarily or merely decide for the convenience of both parties, Mr. Carter and yourself, that that was a good location for this fence?

"A No.

"Q You weren't attempting at that time to deviate from the line that had been legally established?

"A No.

"Q You were trying to confirm what had been legally established as the boundary line, am I correct?

"A Yes, to my knowledge.

"Q So if the original fence was not in fact on the surveyed boundary line, it was a result of an error; is that right?

\* \* \* \* \* \*

"A Well, evidently it was an error to my knowledge.

\* \* \* \* \* \*

"A Mr. Carter and I assumed that that was the boundary of Lots 13 and 14.

\* \* \* \* \* \*

"Q And you used the footage as indicated on what presumably was the official plat of the property?

"A That's right.

"Q But it was all towards an attempt to define on the ground, was it, where the actual legal boundary between Tract A and Lot 14 was?

"A Yes.

\* \* \* \* \* \*

"Q What you did was you measured the best you can, you made an approximation where you thought the boundary line was, and you agreed that it would be one or two feet either way; is that correct?

"A That's correct."

██ This evidence from the plaintiffs' only witness clearly shows that the parties undertook by parol agreement to fix the location of a boundary line under the belief that they were fixing the true boundary line, when in fact it was not, and their agreement was not binding under the law (12 Am.Jur.2d, Boundaries, § 82) as set out in paragraph E of the trial judge's memorandum decision. See Bemis v. Bradley, 126 Me. 462, 139 A. 593, 69 A.L.R. 1399, and cases cited in footnote 12 of § 82 (Am.Jur.2d, Boundaries), supra.

With reference to Wood v. Bapp, 1918, 41 S.D. 195, 169 N.W. 518, while it contains discussion and statements of law pertaining to boundary lines, it appears that much of it is dicta and by the last paragraph of the opinion the reversal was predicated on the admitted 20-year adverse possession (1892 to 1916) of defendants which barred plaintiffs' action.

That opinion recognizes the law set out in paragraph E of the trial judge's memorandum decision where it states:

"These parties were fully agreed that the boundary was a fixed distance from a known line. If then, after learning that they were thus agreed, they had said, 'Our line is 160 rods west of the east section line, and a line so located shall be our boundary,' such agreement would have been exactly as though they had found stakes which they supposed were, but which were not, government stakes marking quarter corners, and *both fully believing them to mark the true line* had agreed that they did. Such an agreement would be without consideration. * * * [The agreement] was therefore not binding upon either party." (emphasis supplied)

The parol agreement not being valid,[2] the judgment is reversed.

All the Justices concur.

---

2. Plaintiffs not having been in possession of the property involved for 20 years as required by SDCL 15-3-1, formerly 1903 C.C.P., § 43 mentioned in Wood v. Bapp, supra, they are unable to rely on the claim of adverse possession.